|  |  |
|---|---|
| )<br>)<br>LATEISHA SAWYER, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>Michael J. Astrue, )<br>Commissioner of Social )<br>Security )<br>Defendant. ) | Case. No. 10 C 8019<br><br>Magistrate Judge<br>Arlander Keys |

## MEMORANDUM OPINION AND ORDER

### FACTUAL BACKGROUND

A. <u>Procedural History</u>

On August 28, 2007, Plaintiff Lateisha Sawyer applied for
Social Security Disability Insurance Benefits. Record at 27.
She alleged that she had become disabled and unable to work on
March 29, 2007. Record at 27. The Social Security
Administration denied Ms. Sawyer's claim on February 6, 2008, and
denied it again on reconsideration on June 9, 2008. Record at
27. Ms. Sawyer requested a hearing before an Administrative Law
Judge (the "ALJ"). Record at 27. ALJ Steven H. Templin held a
hearing on August 3, 2009, in Oak Brook, Illinois, at which Ms.
Sawyer appeared personally, with counsel. Record at 27.

The ALJ issued an opinion denying Ms. Sawyer's claim on
February 11, 2010. Record at 27. The ALJ found that, while Ms.
Sawyer had a medically determinable impairment, her impairment

did not satisfy the criteria of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925, and 416.926). Record at 31. Additionally, the ALJ found that, despite her impairments, Ms. Sawyer remained capable of performing a range of unskilled work on a regular and continuing basis. Record at 32.

Ms. Sawyer appealed the ALJ's decision, and on October 12, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Ms. Sawyer then filed this lawsuit, on December 17, 2010, seeking review of that decision. The parties consented to proceed before a United States Magistrate Judge, and the case was assigned to this Court. The parties then filed cross motions for summary judgment. Ms. Sawyer seeks reversal or remand, arguing that the ALJ: (1) the ALJ misinterpreted and failed to explain the weight, if any, given to the opinions of her treating physician; (2) the ALJ failed to address inconsistencies between the testimony of the vocational expert and the Dictionary of Occupational Titles; and (3) the ALJ did not properly evaluate Ms. Sawyer's credibility. The Commissioner disagrees and asks the Court to affirm the decision to deny benefits.

B.   Proceedings Before the ALJ

   1.   Testimony of Lateisha Sawyer

At the hearing before the ALJ, Ms. Sawyer appeared personally, with counsel. She testified that, until March 2007, she had worked as a technician and Lasix coordinator in the ophthalmology department at Loyola University Medical Center. Record at 60. Ms. Sawyer testified that, in March 2007, she suffered an electrical shock while examining a patient as part of her work at Loyola. Record at 60. She went to the emergency room immediately, and later followed up with her primary care physician, who referred her to a psychiatrist, who subsequently referred her to a psychologist. Record at 60.

Ms. Sawyer testified that she could not continue her prior work after the accident because she was unable to work with numbers, as her job required. Record at 62. She said that she "couldn't take care of the patients the way [she] could before [her] accident." Record at 62. In addition, Ms. Sawyer testified that she had trouble speaking after the accident - both trouble finding the right words to express herself, and trouble with stuttering. Record at 63. She testified that she had "problems getting the words out and breathing" and trouble concentrating, that speaking was "stressful and difficult," and that it got worse as the day went on. Record at 63. She

3

testified that she continued to experience these difficulties, even at the ALJ hearing. Record at 63. Even with speech therapy, Ms. Sawyer said, her speech problem was so severe that it could take her two hours to make a phone call to a business, due to operators being unable to understand her. Record at 69.

Ms. Sawyer further testified that hearing high-pitched sounds, like metal on metal or sirens, caused her to black out and left her unable to function for a long time afterwards. Record at 64. Asked to explain this, she said that "I was told that I suffered a seizure from the shock and my hearing has been enhanced." Record at 65. She testified that this problem persisted even with noise-reducing earplugs. Record at 65. Even during the ALJ hearing, while she was wearing her earplugs, Ms. Sawyer testified that the sound of typing in the room was so disturbing that "I'm working very hard not to let the sounds get to me to the point I get dizzy." Record at 65. In addition, Ms. Sawyer testified that she suffered from tremors, which, like her other health problems, started only after she "was shocked horribly" at work. Record at 66.

Regarding her home life, Ms. Sawyer testified that she lived mostly by herself, but often had family in the house to help her. Record at 66. She testified that relatives helped her prepare meals, ran her bath for her, got her to her medical appointments,

and helped her with cleaning and other household chores. Record
at 66. Ms. Sawyer said she required this assistance because she
found household chores "overwhelming," and she became
"exhausted." Record at 66. She testified that her family made
most of her meals for her, because she could not cook for herself
– she would get too tired and sometimes forget that the stove was
on. Record at 77. In addition, she said she had trouble with
basic personal hygiene tasks, like bathing and brushing her
teeth. Record at 70. She testified that she had to leave notes
around the house reminding herself to brush her teeth and wash
her face, and that, because she had gained weight since her
accident, she found it physically exhausting even to dress
herself. Record at 70.

Ms. Sawyer further testified that her condition prevented
her from driving, although she had never had to surrender her
driver's license to the state. Record at 73. Besides going to
medical appointments with relatives' help, Ms. Sawyer testified
that she managed to leave the house only twice a month. Record
at 71. These outings were limited to walking to the store with a
neighbor to buy drinking water. Record at 71. She testified
that she went to the store twice a month, and bought two gallons
of water per outing. Record at 74. The ALJ questioned this,
pointing out that four gallons seemed like very little drinking

water for a whole month. Record at 74. Ms. Sawyer was unable to clarify this matter.

In addition, Ms. Sawyer testified that she experienced anxiety when people crowded or confronted her, or when she heard certain high-pitched sounds. Record at 76-77. In such situations, she testified, she loses her concentration, she finds it difficult to walk, her tremors get worse, and she becomes extremely exhausted. Record at 76. She also testified that she had trouble concentrating in other contexts. Record at 77. She testified that she spends her days at home alone reading the Bible, but that she has to read everything several times before she can understand it. Record at 77.

2. Testimony of the Internal Medicine Expert

Next, the ALJ heard from Dr. James McKenna, who testified as an expert in internal medicine. Dr. McKenna testified that Ms. Sawyer's most well-established physical conditions that could possibly be considered impairments were obesity and asthma. He testified that the "most obvious impairment on the first evaluation is that she is an obese subject." Record at 46. Dr. McKenna noted that Ms. Sawyer's original disability application said she was 66 inches tall and weighed 191 pounds, but that her records indicated she weighed about 220 pounds at the time of the hearing. Record at 46. Based on Ms. Sawyer's medical records,

6

Dr. McKenna characterized this as an "exogenous obesity," not due to any medical or metabolic condition. Record at 46. Dr. McKenna testified that Ms. Sawyer's obesity was "mild," and that he saw no evidence of her obesity causing musculoskeletal, respiratory, or any other kind of impairment. Record at 48-49.

Dr. McKenna also noted that Ms. Sawyer had some history of asthma, based on her being prescribed an Albuterol inhaler to use as needed. Record at 47. However, he testified that, because Ms. Sawyer had never been prescribed an ongoing control medication like Singulair or an inhaled steroid, he did not consider this an impairment; he testified that the asthma diagnosis was "not too well established." Record at 47.

Dr. McKenna testified that Ms. Sawyer's medical records showed a recent history of syncope, or passing out. Record at 45. He noted Ms. Sawyer's complaint of syncope was evaluated with a tilt table test and an EEG, but that he did not "see a water tight syncope work up in the file." Record at 46. He also noted an "isolated" finding of borderline pulmonary hypertension, based on an echocardiogram taken August 15, 2005. Record at 49. Dr. McKenna characterized this as a "one-shot deal," with normal ejection fraction and no evidence of significant arrhythmia, indicating that she had no underlying heart problem. Record at 49.

Dr. McKenna noted that, while Ms. Sawyer had a variety of other complaints about her physical health, he saw no support for other medical conditions in her medical record. Record at 47. Dr. McKenna testified that, despite Ms. Sawyer's complaints of seizures, "there was really no evidence of a seizure disorder at all." Record at 78. Dr. McKenna noted that the seizure complaints began some time after Ms. Sawyer's accident, and that an EEG and MRI of the head, performed immediately after the accident, had been normal. Record at 78. Dr. McKenna testified that Ms. Sawyer's complaints of speech difficulties similarly failed to disclose any underlying medical condition. He testified that "the file is pretty replete . . . [with] experts who examined her and they felt that the problem with speech was a functional problem. It wasn't an organic problem." Record at 80. Dr. McKenna also noted that, Ms. Sawyer had complained of left-side paralysis immediately after her accident, when she was not, in fact, paralyzed on the left side. Record at 79. Therefore, Dr. McKenna testified that he would only place one restriction on Ms. Sawyer's activity: if her asthma diagnosis were accepted, then he would have her "avoid concentrated exposure to extreme cold or to respiratory irritants as defined in the RFC," such as "dust, fumes, [and] gases." Record at 50.

### 3. Testimony of the Psychiatric Expert

Next, the ALJ heard from Dr. Kathleen O'Brien, who testified as an expert in psychiatry. Dr. O'Brien testified that Ms. Sawyer's medical records presented "a lot of conflicting evidence," and Dr. O'Brien suggested several possible impairments: affective disorder (12.04) because of her problems with depression; PTSD and anxiety (12.06); and a conversion disorder (12.07). Record at 51. However, Dr. O'Brien testified that two of the conditions suggested by Ms. Sawyer's records — PTSD and conversion disorder — were inconsistent with each other. Record at 51. She testified that Ms. Sawyer could be afflicted with either PTSD or a conversion disorder, but not both. Record at 51. Dr. O'Brien opined that, based on Ms. Sawyer's records, the better supported diagnosis was PTSD with anxiety. Record at 51.

Dr. O'Brien testified that she found inconsistencies in Ms. Sawyer's records: "[W]e vacillate from records which indicate a very severe impairment to records that suggest very good functioning. . . . [W]e also have a consultative exam, the conclusion of which was that we were looking at malingering and exaggeration." Record at 52. Dr. O'Brien pointed to a consultative exam in which Ms. Sawyer seemed severely impaired and the examining physician, Dr. Peggau, suggested the need to

9

rule out malingering. Record at 53. But Dr. O'Brien testified that, in another exam just days prior, Ms. Sawyer "[did] not present to her therapist as being anything like the level of incapacitated that she was in Dr. [Peggau's] office." Record at 52.

Dr. O'Brien testified that she noted another inconsistency in Ms. Sawyer's account of her social function:

> Social functioning, there's evidence . . . that she's made a trip to Arizona. That she goes to restaurants with friends. That she's made a trip to Las Vegas. That she's been on a cruise. That she's able to take Metra, but there are other documentations that say she's too scared to leave the house. So this is what I mean by the contradiction. Record at 53.

Dr. O'Brien opined that, while some variation is normal, Ms. Sawyer's records showed extreme variations in mental function that were inconsistent with any condition established by the record:

> Variable, but not to that extreme. In other words, yes, you can [have] better days and you're going to have not so good days. . . . [B]ut to go from not knowing the date of your birth and. . . . not being able to count and simply not being able to function at all to within a couple of days later being able to do not only all of those things, but to be able to articulate to a therapist the things that are bothering you. And what you're doing about them and how you're trying to work with them. That's not very consistent. Record at 53-54.

Dr. O'Brien also testified that, based on her view of the record, Ms. Sawyer's complaints suggested two inconsistent and incompatible conditions. Dr. O'Brien testified that Ms. Sawyer's complaints of physical symptoms with no apparent physiological basis, like seizures and syncope, were consistent with a conversion disorder (a condition Dr. O'Brien testified was quite rare). Record at 80-81. However, Dr. O'Brien testified that Ms. Sawyer's continued complaints of anxiety were inconsistent with a conversion disorder. Record at 81. Rather, these complaints were consistent with PTSD. Record at 81. Dr. O'Brien opined that, based on the medical records, PTSD was the better-supported diagnosis. Record at 51.

Dr. O'Brien testified that, in addition to Ms. Sawyer's complaints of anxiety and difficulty concentrating, and her physical complaints, Ms. Sawyer complained of difficulty speaking. Record at 55. Dr. O'Brien testified that the record showed that Ms. Sawyer had had some trouble speaking, but that her speech had much improved over the 15 or 16 months prior to the hearing. Record at 55.

Dr. O'Brien testified that, whatever the underlying diagnosis, Ms. Sawyer's complaints indicated that her residual mental functional capacity would limit her to certain kinds of work; she testified that Ms. Sawyer's complaints of anxiety and

difficulty concentrating would limit her to simple tasks and "limited, probably incidental public contact." Record at 54. Dr. O'Brien opined that Ms. Sawyer could have limited interaction with co-workers and supervisors, but could not handle intense, close supervision. Record at 54. She also testified that Ms. Sawyer could not do work with "above average production quotas," like working on an assembly line. Record at 54. However, Dr. O'Brien testified that Ms. Sawyer could do some other work with a steady, average pace. Record at 55.

### 4. Testimony of the Vocational Expert

The ALJ next heard testimony from Cheryl Hoiseth, who testified as a vocational expert ("VE"). The VE first reviewed Ms. Sawyer's vocational profile. She testified that Ms. Sawyer was 34 years old at the time of the hearing and had received an associates degree in applied science in 1999. Record at 82. She testified that Ms. Sawyer had engaged in substantial gainful activity ("SGA") from 1994 to 1999. Record at 82. During that time, Ms. Sawyer worked as a clerk typist, which the VE described as sedentary, semi-skilled work with a specific vocational preparation ("SVP") time of 4. Record at 83. During that period, Ms. Sawyer was also a part-time sales clerk at Nordstrom's, which the VE characterized as light, semi-skilled work with an SVP of 3. Record at 83. Also during that period,

Ms. Sawyer was a patient care assistant in an ophthalmologist's office. Record at 83. The VE compared that work to the job of a nurse's aide in the Dictionary of Occupational Titles, thus designating it medium, semi-skilled work with an SVP of 4. Record at 83.

The VE testified that Ms. Sawyer did not engage in SGA from 2001 to 2003, but that she again engaged in SGA from 2004 to 2007, when she worked as an ophthalmology technician and Lasix assistant, both at Loyola and in an infirmary. Record at 83. The VE compared this work to the job of an ophthalmic assistant in the Dictionary of Occupational Titles, thus designating it sedentary, skilled work with an SVP of 6. Record at 83. The VE testified that, in Ms. Sawyer's own work history report, Ms. Sawyer had described all of her past work as "heavy," in contrast to the designations provided in the Dictionary of Occupational Titles. Record at 83.

The VE then testified to Ms. Sawyer's residual functional capacity as described by the medical experts at the time of the hearing. She testified that, based on Dr. O'Brien's testimony, Ms. Sawyer did not have the residual functional capacity to do any of her past jobs, either at the heavy exertional level Ms. Sawyer described or at the exertional levels at which they were normally performed. Record at 83.

The VE next testified to three jobs that Ms. Sawyer could still perform with her residual functional capacity: housekeeping cleaner, an unskilled light job with an SVP of 2 and 10,000 jobs; mail sorter, an unskilled light job with an SVP of 2 and 5,900 jobs; and hospital food service worker, an unskilled medium job with an SVP of 2 and 1,600 jobs. Record at 84. The VE explained that she had not looked at any sedentary jobs for Ms. Sawyer, because such jobs were either more complex than simple, or required high production standards. Record at 84.

The VE testified that none of the three jobs she suggested involved any more than moderate noise levels. Record at 86. She testified that any of the jobs presented *some* possibility of hearing the sort of high-pitched noise that Ms. Sawyer had described as causing her difficulty. Record at 86. However, the VE noted that the possibility of hearing such a sound was no greater in any of the three work environments than it was in everyday life. Record at 86. The VE also testified that none of the three jobs she recommended would require exposure to concentrated pulmonary irritants. Record at 87. The VE also testified that the jobs she had suggested were appropriate because they did not require a maximum level of attention and concentration. Record at 87. Rather, she testified, the recommended jobs required that the worker have the ability to

concentrate and attend to the job at least 80 % of the time.
Record at 87.

5.   Medical Records Before the ALJ

     a.   Primary medical care

In addition to the testimony above from Ms. Sawyer, the
medical experts, and the VE, the ALJ also had before him Ms.
Sawyer's medical records from the relevant period.

The medical records show that Ms. Sawyer went to the
emergency room at Loyola Medical Center on March 29, 2007,
complaining that she had received an electrical shock.  Record at
316.  According to the emergency room records, Ms. Sawyer said
that she had touched a dimmer switch in the clinic she worked in
and felt a shock through her body.  Record at 316-17.  Ms. Sawyer
said at that time that she felt "a little stunned and sat down."
Record at 317.  In addition, a pre-hospital communications report
indicated that, before arriving at the emergency room, Ms. Sawyer
complained of left-sided paralysis and feeling "sluggish," and
was slow to answer questions.  Record at 329.  The emergency room
records showed that, when Ms. Sawyer came to the emergency room,
she complained of confusion and weakness in her left hand, with
no numbness or tingling and no incontinence.  Record at 329.  A
physical exam in the emergency room revealed that Ms. Sawyer was
alert and oriented, was able to move all extremities, and had

equal strength and normal sensation in all extremities. Record at 329. Ms. Sawyer spoke normally at that time and was in no acute distress. Record at 329. An EKG at the time showed a normal heart rhythm with no abnormalities. Record at 329.

The emergency room record also shows that, at the time of her shock, Ms. Sawyer was already taking Lexapro (an antidepressant) and Meridia (a weight-loss drug). Record at 324. After evaluation, Ms. Sawyer was discharged from the emergency room the same day. She received no treatment, and was sent home with instructions to drink lots of fluids and to call occupational health the next week for follow-up. Record at 324.

The medical records show a long series of doctor visits following Ms. Sawyer's March 2007 accident. These visits illustrate changes in Ms. Sawyer's complaints and in her doctors' approaches, assessments, and treatments.

On April 19, 2007, Ms. Sawyer saw Dr. Stephanie M. Mauch for a follow-up from her shock. Record at 260. At this time, Ms. Sawyer complained of fatigue, tearfulness, anxiety, shortness of breath, feeling tired, feeling like her heart was racing, and feeling clammy. Record at 260. Ms. Sawyer also complained that she had difficulty falling asleep at night and waking up in the morning, in addition to problems with concentration and memory.

Record at 260. Dr. Mauch gave Ms. Sawyer Lexapro and Lunesta (a sleep aid). Record at 260.

On May 1, 2007, Ms. Sawyer returned to the emergency room at Loyola. Record at 302. According to the emergency room records, Ms. Sawyer complained that, while back working in the ophthalmology clinic, she had been told it was safe to go into the room, even though she believed the room had not yet been cleared as safe. Record at 303. Ms. Sawyer complained that this caused her anxiety, a racing heart, shortness of breath, chest tightness, and dizziness for several hours. Record at 303. When the doctor saw her, Ms. Sawyer reported that she felt much better since she got to the emergency room; by the time the doctor examined her, she had no complaints. Record at 303. During this emergency room visit, Dr. Joan Dimopoulos offered Ms. Sawyer a psychiatric evaluation, but Ms. Sawyer declined. Record at 303. Dr. Dimopoulos also offered Ms. Sawyer Klonopin (a drug used to treat panic attacks), but Ms. Sawyer again declined. Record at 303. Ms. Sawyer was discharged with no special instructions, and was told she could return to work the next day. Record at 310.

On February 20, 2008, Ms. Sawyer returned to her primary care physician, Dr. Mauch, complaining of two weeks persistent pain on the left side of her body, radiating from her left hip to her left leg. Record at 449. She said that her pain worsened

17

when a table fell on her legs about one week ago. Record at 449. Dr. Mauch sent Ms. Sawyer to physical therapy—Ms. Sawyer reported some relief, but continued to limp. Record at 453.

On March 14, 2008, Ms. Sawyer returned to Dr. Mauch, complaining of heavy breathing and wheezing during her panic attacks, increased sensitivity to sound, sleep apnea, and back pain. Record at 453. Dr. Mauch gave Ms. Sawyer a Proventil inhaler to use as needed for her breathing. Record at 454. She prescribed a cane for Ms. Sawyer's back and hip pain, as well as continued physical therapy and stretching. Record at 454. Dr. Mauch ordered a hearing test to evaluate Ms. Sawyer's complaint of increased sensitivity to sound. Record at 454.

On March 28, 2008, Ms. Sawyer again returned to Dr. Mauch complaining of occasional breathing problems with her anxiety attacks. Record at 455. Dr. Mauch discussed breathing and relaxation techniques with Ms. Sawyer, and advised her to continue use of her inhaler. Record at 456.

On April 8, 2008, Ms. Sawyer went to the emergency room at LaGrange Hospital after vomiting and passing out during her physical therapy. Record at 457. Ms. Sawyer was discharged from the emergency room the same day, and followed up with Dr. Mauch the next day. Record at 458. Dr. Mauch referred Ms. Sawyer to

an ear, nose, and throat specialist for further evaluation.
Record at 458.

On May 21, 2008, Ms. Sawyer returned to Dr. Mauch
complaining of continued hip pain and anxiety, and for follow-up
on tilt tests related to her passing out. Record at 529. The
tilt tests showed no abnormality, and Dr. Mauch advised Ms.
Sawyer to continue with her ongoing treatment plans for pain and
anxiety. Record at 530.

On October 23, 2008, Ms. Sawyer returned to Dr. Mauch,
complaining of constipation, which she said had started some
years earlier, and continued hip pain. Record at 537. Dr. Mauch
advised Ms. Sawyer to take Miralax, eat more fiber, drink plenty
of water, and engage in physical activity. Record at 538.

On December 11, 2008, Ms. Sawyer again returned to Dr.
Mauch, for follow up after passing out in another doctor's
office. Record at 541. Ms. Sawyer had been sent to the
emergency room via ambulance, rehydrated in the emergency room,
and sent home. Record at 541. During this visit, Ms. Sawyer
also complained of heavy menstrual bleeding and weight gain.
Record at 541. The menstrual bleeding was not followed up on,
but the weight gain was attributed to antidepressants, anxiety,
decreased mobility, decreased physical activity, and sleep
disorder. Record at 541. Dr. Mauch advised Ms. Sawyer to

19

investigate whether her insurance would cover bariatric surgery. Record at 541.

### b. Neurological care

During the summer after Ms. Sawyer's shock, Dr. Mauch referred her to several other doctors to assess the cause of her continued complaints of tremors and stuttering. On August 6, 2007, Ms. Sawyer had an MRI of her brain, in response to her persistent complaints of speech problems since her shock. Record at 331. The examiner's initial impression was "normal MRI examination of the brain." Record at 331.

On August 8, 2007, Ms. Sawyer saw Dr. Armita Bijari, a neurologist, on a referral. Record at 336. According to Dr. Bijari's report, Ms. Sawyer complained that, when she first touched the light switch in March, she felt a shock go through her whole body, fell to the floor, urinated on herself, passed out, and was "paralyzed all over." Record at 336. Ms. Sawyer complained that, since that day, she had severe anxiety, tremors, and severe stuttering. Record at 336. Upon examination, Dr. Bijari noted that, while Ms. Sawyer stuttered, her stuttering was "nonphysiologic." Record at 336. Dr. Bijari noted that Ms. Sawyer's tremors were also "very distractible and nonphysiologic." Record at 337. Dr. Bijari ordered thyroid tests and an EEG to rule out seizures, but expressed doubt that

Ms. Sawyer actually suffered from seizures. Record at 337. Dr. Bijari's immediate impression was that Ms. Sawyer's "symptoms are nonorganic." Record at 337.

Dr. Bijari saw Ms. Sawyer again on August 27, 2007. Record at 335. Dr. Bijari wrote a prescription for Ms. Sawyer to take four weeks of speech therapy if she wanted. Record at 335. However, Dr. Bijari concluded that Ms. Sawyer's symptoms had no neurological cause, possibly from a conversion reaction. Record at 335. Dr. Bijari said Ms. Sawyer would not need to see him again. Record at 335.

### c. Psychiatric care

In addition to these neurological consultations, Ms. Sawyer's primary care physician, Dr. Mauch, also referred her to Salt Creek Therapy Center for psychiatric care. Record at 397. Upon Ms. Sawyer's initial evaluation at Salt Creek Therapy Center, the examining physician found her anxious and tearful when describing her shock. Record at 397. Ms. Sawyer also complained of panic attacks, trouble sleeping, memory problems, and depression. Record at 397. The examining physician diagnosed Ms. Sawyer with "adjustment disorder [with] depression and anxiety," and "[rule out] PTSD." Record at 398-99. The doctor discontinued Ms. Sawyer's Lexapro, and instead prescribed Zoloft (another antidepressant). Record at 399. Progress notes

from Salt Creek Therapy Center show that Ms. Sawyer continued visiting for therapy with Dr. Jodi McInerney at one- to two-week intervals until December 27, 2007.  Record at 377.

During her first therapy session, on June 28, 2007, Ms. Sawyer again complained of problems sleeping, frequent panic attacks at work, and flashbacks of her accident.  Record at 396. Ms. Sawyer also complained that she felt humiliated by the way she was treated in the emergency room on the day of the accident. Record at 396.  Dr. McInerney wrote a note to excuse Ms. Sawyer from work until she was stable.  Record at 396.  Dr. McInerney also planned to work on self-management skills with Ms. Sawyer, and to consider eye movement desensitization and reprocessing therapy to address Ms. Sawyer's trauma.  Record at 396.

Over the next six months, Ms. Sawyer had regular therapy. The progress notes from these sessions show Ms. Sawyer's condition sometimes improving and sometimes worsening.  On July 11, 2007, Ms. Sawyer appeared highly anxious and depressed, with shaking and stuttering.  Record at 395.  On July 24, 2007, Ms. Sawyer appeared even more depressed and tearful, and continued stuttering, but her tremors were somewhat improved.  Record at 393.  According to the progress notes from July 24, Ms. Sawyer had also attended a Christian convention before that visit. Record at 393.  On August 9, 2007, Ms. Sawyer complained that she

22

had had a panic attack while at a restaurant with friends, and was discouraged by that setback. Record at 391. Dr. McInerney recommended that she use noise-reducing earplugs to avoid being upset by loud noises. Record at 391. On August 14, Ms. Sawyer was "really down" because of financial problems, Dr. Bijari's conclusion that her symptoms were nonorganic, and her employer's decision to contest her request for workman's compensation. Record at 390. On August 30, Ms. Sawyer again complained of depression and anxiety, and told Dr. McInerney that she would be flying to Arizona the next day with her family. Record at 389. After returning from her trip, Ms. Sawyer remained depressed, anxious, and frustrated with her treatment from other doctors, but said that she had tried to enjoy herself in Arizona. Record at 388.

On September 24, Ms. Sawyer appeared especially distressed in her therapy session. She said that she cried every day out of embarrassment at having to get a Link Card, and Dr. McInerney described her as "extremely depressed." Record at 386. At her next therapy session, on October 1, Ms. Sawyer reported that she had thought about suicide the prior week. Record at 385. At her next session, on October 8, Ms. Sawyer continued to be depressed and frustrated at her loss of independence since the accident and the increased burden she felt she placed on her family. Record

at 386. On October 24, Dr. McInerney noted that her stuttering was markedly worse than it had been. Record at 383. However, Ms. Sawyer "brightened up a bit and stuttered a little less when talking about her nephew." Record at 383. On October 29, Ms. Sawyer was again "highly distressed" because her anxiety and PTSD interfered with her driving ability, which had caused her to miss church for several weeks. Record at 382. On November 9, Ms. Sawyer reported that she had started to feel better, but then regressed because of frustration with her workman's compensation claim. Record at 381. Ms. Sawyer reported that she was frustrated and stressed by the situation, but reported that her lawyer "insists that she follow through." Record at 381. However, Ms. Sawyer reported that friends were putting together a trip for her in December. Record at 381.

On her November 12 visit, Ms. Sawyer reported some improvement. She reported that she had worked on getting out more, and had even managed to go to a wedding over the weekend and enjoy herself. Record at 380. On November 19, she again showed some improvement, although her stuttering was worse than usual. Record at 380. Ms. Sawyer reported that she had begun to ride the train, and enjoyed seeing some old friends as a result. Record at 380. However, she reported that she needed earplugs because the noise of the train caused her to panic, and remained

"very distressed" about her employer's response to her injury. Record at 380. On November 26, Ms. Sawyer reported that, although she was still worried about her finances, and although it was still an effort to be around others, she was trying to get out even more. Record at 379. Ms. Sawyer reported that she had been trying to involve herself in her faith community, that she had been touched by her friends' generosity, and that she was travelling with friends the next week. On December 10, after her trip with friends, Ms. Sawyer reported that she had gone on a cruise. Record at 380. She reported that she found the cruise partly good and restful, but reported that she had a panic attack when she became upset over an expense on the ship. Record at 380.

The progress report dated December 27, noted that Ms. Sawyer was benefiting from speech therapy. Record at 377. Dr. McInerney also noted that Ms. Sawyer walked with a new, unusual gait that day, "almost like her feet were made of lead." Record at 377. Ms. Sawyer reported that she had run out of her medications and would not be able to afford them for several days. Record at 377.

A gap in Ms. Sawyer's therapy visits appears between January 10, 2008, and March 7, 2008. January 10 appeared, from the progress notes, to be an unexceptional visit. Ms. Sawyer

continued to stutter, and spoke of having had a "cruel week."
Record at 429.  On March 7, 2008, the therapist who saw Ms.
Sawyer reported that her speech and stuttering were much
improved.  Record at 430.  Ms. Sawyer's mood and anxiety were
also improved, although she continued to have occasional panic
attacks.  Record at 430.  During this session, Ms. Sawyer
informed the therapist that she was starting physical therapy for
pain and weakness on her left side.  Record at 430.

On April 8, 2008, Ms. Sawyer told her therapist that she was
anxious because she felt she had been mistreated at a hospital
earlier that day.  Record at 431.  Ms. Sawyer told the therapist
she had had a fainting episode caused by loud music, and was
unhappy with the way she was treated in the emergency room before
being discharged.  Record at 431.

     d.   <u>Speech therapy</u>

Ms. Sawyer began speech therapy at Fox Valley Speech &
Swallowing Center on November 28, 2007, on the recommendation of
her psychiatrist, Dr. Lima, and her primary care physician, Dr.
Mauch.  Speech-language pathologist Celeste R. Kobulnicky
performed an initial evaluation on November 28, and concluded
that Ms. Sawyer's stuttering was psychogenic (of psychiatric
origin), because it did not resemble any stuttering that would be
caused by a developmental or neurological problem.  Record at

436. Ms. Sawyer had nine visits with the speech therapist between November 28, 2007, and April 10, 2008, during which she showed some improvement. On April 10, 2008, Ms. Sawyer had "very few fluency difficulties (almost none)," and "spoke very confidently." Record at 446.

   e.  <u>Physical therapy</u>

  Ms. Sawyer's primary care physician, Dr. Mauch, referred her to physical therapy for complaints of pain in her left hip, leg, and shoulder. Record at 470. She had her first visit on March 13, 2008, and complained of pain all over the left side of her body. Record at 527. She rated the pain's severity as 10, on a scale of 1-10. Record at 527. By March 25, 2008, her pain had somewhat reduced, to 8.5 out of 10. Ms. Sawyer's pain continued to improve with physical therapy.

 On April 8, 2008, Ms. Sawyer passed out while doing her physical therapy exercises. Record at 506-08. The records show that, while doing exercises with a therapist, Ms. Sawyer walked across the room to a bench, kneeled in a slow and controlled manner, and rested her head on her supportive right arm. Record at 507. The doctor on duty, Dr. Pinckney, was called, and arrived within 30 seconds to find Ms. Sawyer alert and oriented in the same kneeling position. Record at 507. Dr. Pinckney helped Ms. Sawyer to her feet and started walking with her to

another room for further evaluation. Record at 507. She then "suddenly lost her balance and slowly let herself down to her backside with the doctor's assistance." Record at 507. The doctor sent chiropractic assistant Frank Bucki to call 911. Record at 507. While waiting for EMS, Ms. Sawyer began vomiting what Mr. Bucki described as "a frothy green liquid, almost bile-like in appearance." Record at 507. Mr. Bucki noted "several chunks of undigested pill-like material" in the vomit, which he interpreted as "reveal[ing] ingestion of a more than appropriated dosage." Record at 507. Dr. Pinckney also noted "significant medication remains" in the vomit. Record at 506. Dr. Pinckney concluded that Ms. Sawyer "appear[ed] to have been overmedicated before treatment." Record at 506. Ron Lau, another employee who had not worked with Ms. Sawyer, reported that he had seen her take "some type of pills" from her bag before starting her physical therapy. Record at 508.

Ms. Sawyer returned to physical therapy the next day, and continued to attend therapy several times a week, with continual improvement. Record at 506. The last visit on the record was on June 5, 2008, when Dr. Pinckney noted that she had "responded well to care." Record at 468. At that point, Ms. Sawyer was "walking longer distances with less pain and at a faster pace,"

with some remaining pain, which she rated approximately 4 out of 10.  Record at 469.

### f.  Assessments done at the behest of the SSA

On January 11, 2008, Ms. Sawyer saw John L. Peggau, a psychologist, for a referral, as required by Disability Determination Services.  Record at 405.  Dr. Peggau reported that Ms. Sawyer did not know her own age when asked, and had to refer to her own driver's license to determine her date of birth. Record at 405.  He described Ms. Sawyer as speaking with a "very slow, dramatic speech that had constant stuttering and stammering while wearing dark sunglasses and a hooded coat."  Record at 401. Dr. Peggau described Ms. Sawyer's stutter as "unlike that which the examiner has ever witnessed with a physiological basis." Record at 403.  Dr. Peggau reported that Ms. Sawyer "walked with a shuffling gait like a geriatric resident," held onto the chair rail in the hallway as she walked, wore earplugs throughout the evaluation, and was "extremely dramatic."  Record at 402.  Dr. Peggau described Ms. Sawyer's demeanor as "passive aggressive and somewhat antagonistic," and noted that she gave indirect answers, refused to clarify her answers, and "rambled on unrelated response contents."  Record at 402.

Ms. Sawyer was unable to give the current date because, she said, "[n]umbers are hard for me."  Record at 402.  Nor could she

identify the current month. Record at 402. When asked who the current president was, Ms. Sawyer replied, "I don't remember anything but George Washington!" Record at 402. Ms. Sawyer was unable to name five famous living people; she could only think of three. Record at 402. Similarly, when asked to name five large cities, she could only name three. Record at 402. Dr. Peggau reported that, when asked the colors of the American flag, Ms. Sawyer "sobbed hysterically and kept saying 'A flag, a flag, a flag, a flag.'" Record at 402. Ms. Sawyer could only identify red. Record at 402. Ms. Sawyer was unable to recall three digits forward, or any digits in reverse order. Record at 402. Ms. Sawyer denied knowledge of any news events at all. Record at 402. She was unable to perform simple addition, subtraction, or multiplication, and could not remember four simple words that had been read to her 30 minutes earlier. Record at 404.

This 65-minute evaluation left Dr. Peggau with "some concern that the claimant may have been embellishing some of her impairment, or malingering throughout the examination." Record at 404. He further noted that "[s]he presented as extremely emotionally unstable unlike anything the present examiner has seen clinically." Record at 404. Dr. Peggau's Axis I diagnosis was "Rule out malingering." Record at 404.

When Dr. Peggau asked about her daily life, Ms. Sawyer said sometimes she did not sleep because she was "afraid of the shock," while sometimes she did not get out of bed unless she had a medical appointment. Record at 403. When asked how often she bathed each week, she answered, "sometimes none because I'm too weak to stand." Record at 403. She said that "no one" did her laundry, and that her sister, aunt, or uncle did her grocery shopping. Record at 403. When asked about her eating habits, Ms. Sawyer said she was sometimes too tired to eat, and when she did, it was usually yogurt, pudding, or ice cream, because she had trouble swallowing. Record at 403.

On January 25, 2008, psychiatrist Hellen P. Appleton, Ph.D., reviewed Ms. Sawyer's records and concluded that the evidence did not establish the presence of any of the "C" impairment criteria (organic mental impairment, schizophrenic impairment, affective impairment, or anxiety-related impairment). Record at 417. Dr. Appleton noted what she perceived to be several inconsistencies in Ms. Sawyer's reporting of her condition. Dr. Appleton noted the behaviors identified in Dr. Peggau's assessment. Record at 418. Dr. Appleton opined that Ms. Sawyer's "[c]redibility is in question regarding the extraordinary behaviors [Ms. Sawyer] exhibited at the [psychological evaluation] and the fact that these behaviors have not always been present according to the

objective medical evidence in file or in the adjudicator's dealings with the [claimant] directly." Record at 418. Dr. Appleton also noted that, Ms. Sawyer presented quite differently to Dr. Peggau than she had to her own psychologist. Record at 418. Ms. Sawyer's psychologist, Dr. McInerney, had established that Ms. Sawyer was able to live alone, had "good" immediate and remote memory, was calm with coherent speech, was appropriate in her appearance, and was oriented with a "good" fund of knowledge and "good" insight and judgment." Record at 418. This was in contrast to Ms. Sawyer's presentation to Dr. Peggau, in which she could not count or state the colors of the American flag. Record at 418.

Dr. Appleton concluded, based on Ms. Sawyer's records, that she was "markedly limited" in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and in her ability to interact appropriately with the general public. Record at 420-21. Dr. Appleton concluded that Ms. Sawyer was "moderately limited" in her ability to: maintain attention and concentration for extended periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. Record at 421. Dr. Appleton concluded that Ms. Sawyer "would work best with

limited social contact due to her stuttering and irritability,"
and that she could "tolerate ordinary job routines and changes"
with that limitation. Record at 422. Dr. Appleton noted that
Ms. Sawyer's diagnoses seemed to be a combination of a conversion
disorder and PTSD, along with a need to rule out malingering.
Record at 422. Dr. Appleton concluded that, beyond Ms. Sawyer's
social contact limitations, "[a]dditional limitations appear to
be due to malingering." Record at 422.

C.    The ALJ's Decision

In a decision dated February 11, 2010, the ALJ concluded
that Ms. Sawyer was not disabled under § 1614(a)(3) of the Social
Security Act. In making this decision, the ALJ applied the five
step inquiry outlined in the Social Security regulations. 20
C.F.R. § 404.1520.

At step one, the ALJ determined that Ms. Sawyer had not
engaged in any substantial gainful activity since her accident on
March 29, 2007. Record at 29.

At step two, the ALJ concluded that Ms. Sawyer had at least
one medically determinable "severe" impairment under 20 C.F.R.
404.1520(c). Record at 30. The ALJ noted that Dr. O'Brien, the
expert in forensic psychology, had testified that the record
indicated that Ms. Sawyer had an affective disorder (§ 12.04 of

the Listing of Impairments) and an anxiety disorder (§ 12.06 of the Listing of Impairments).  Record at 30.

At step three, the ALJ concluded that, despite these conditions, Ms. Sawyer had no impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Record at 31.  In support of this conclusion, the ALJ first noted that Dr. McKenna, the expert in internal medicine, had found the medical evidence inadequate to suggest any musculoskeletal system impairment under the Listing of Impairments.  Record at 31.  With regard to mental impairments, the ALJ noted the psychology expert's opinion that the variation in Ms. Sawyer's mental complaints was greater than expected from one day to the next. Record at 31.  The ALJ noted the psychology expert's assessment that, in the days before Ms. Sawyer's visit to Dr. Peggau, where she showed her most severe symptoms, Ms. Sawyer's own therapist had found no medically severe symptoms.  Record at 31.

At step four, the ALJ concluded that Ms. Sawyer's residual functional capacity would not allow her to perform any of her past relevant work.  Record at 34.  In support of this conclusion, the ALJ first noted the difficulties with concentration and pace cited by Ms. Sawyer's treating physicians.

The ALJ credited Dr. McKenna's opinion that "the medical evidence was inadequate to suggest any musculoskeletal impairment that would be appropriate to evaluate under § 1.00 *et seq.* of the Listing of Impairments." Record at 31. He credited Dr. O'Brien's opinion that the variations in Ms. Sawyer's reported psychological symptoms were inconsistent with any B-criteria impairments. Record at 31.

Based on the medical experts' assessment of Ms. Sawyer's impairments, the ALJ concluded that Ms. Sawyer retained the residual functional capacity to perform a range of unskilled work on a regular and continuing basis. Record at 32. The ALJ briefly summarized Ms. Sawyer's medical records, and credited Dr. McKenna's assessment that inconsistencies with Ms. Sawyer's medical record and her testimony at the hearing suggested no anatomical or physiological cause for her behaviors. Record at 34. He also credited Dr. O'Brien's opinion that Ms. Sawyer's speech impairment was inconsistent with her allegations of ongoing anxiety. Record at 34. Based on these inconsistencies between Ms. Sawyer's medical records and complaints, the ALJ made explicit that he did not credit Ms. Sawyer's testimony:

> I was not convinced by the claimant's presentation at the hearing. It is possible that she actually suffers from disorders that grossly constrict her functioning to the degree she described at the hearing, but this is inconsistent with the degree

of functioning often described within the medical evidence.   Record at 32.

Thus, the ALJ credited the VE's assessment of Ms. Sawyer's ability to work, as it was based on the medical experts' assessment of her residual functional capacity.   Because the vocational expert identified "significant numbers" of jobs in the national economy that Ms. Sawyer could perform, the ALJ denied her claim for disability benefits.

## DISCUSSION

To be entitled to benefits under the Social Security Act, a claimant must be "disabled" within the meaning of the Act – a determination made using the SSA's five-step inquiry.   20 C.F.R. § 404.1520.   At step one, the ALJ determines whether the claimant is employed.   At step two, the ALJ determines whether the claimant has a severe impairment under the SSA's definition.   At step three, the ALJ determines whether the impairment meets or medically equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1.   At step four, the ALJ ascertains the individual's "Residual Functional Capacity" and determines whether she can perform her past relevant work.   Finally, at step five, the ALJ determines whether the claimant is able to perform other work that exists in significant numbers in the national economy.

A district court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barhnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determination." *Skinner v. Astrue*, 478 F.3d 835, 841 (7th Cir. 2007). Should conflicting evidence permit reasonable minds to differ, it is the ALJ's responsibility—not the court's—to determine whether the claimant is disabled. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). While the ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Unless the ALJ fails to rationally articulate the grounds for his decision in a manner that permits meaningful review, the Court must affirm if

there is substantial evidence supporting the ALJ's decision. *Sims*, 309 F.3d at 429.

Ms. Sawyer argues that the Commissioner's decision must be reversed because: (1) the ALJ misinterpreted and failed to explain the weight, if any, given to the opinions of Dr. McInerney, Dr. Appleton, Dr. Alford, and Dr. O'Brien; (2) the ALJ failed to address inconsistencies between the VE's testimony and the Dictionary of Occupational Titles ("DOT"); and (3) the ALJ did not properly evaluate Ms. Sawyer's credibility.

A.    The Weight Given The Doctors' Opinions

1.    Dr. McInerney's Opinion

Ms. Sawyer argues that the ALJ's decision must be reversed because he failed to explain the weight, if any, given to the opinion of Dr. McInerney, a psychologist who treated Ms. Sawyer for much of 2007. Specifically, Ms. Sawyer argues that Dr. McInerney opined on October 8, 2007, that Ms. Sawyer was "unable to return to any work" at that time. Corrected Memorandum in Support of Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security, p. 4. Ms. Sawyer correctly notes that, "[a]lthough ALJs need not address every piece of evidence in detail, they must address significant evidence and explain why strong evidence favorable to the claimant is overcome by the other evidence." *Buckhanon ex rel. J.H. v. Astrue*, 368

Fed. Appx. 674, 678 (7th Cir. 2010). However, this Court is not persuaded that Dr. McInerney ever expressed an opinion that Ms. Sawyer was unable to return to any sort of work at any time. Ms. Sawyer makes this claim by taking Dr. McInerney's words out of context and looking for meaning that simply is not there.

The Court first notes that, while Dr. McInerney did indeed write these words, they were not written as part of any diagnosis or assessment. Nor were they written in the copious progress notes Dr. McInerney generated over months of treating Ms. Sawyer. Rather, Dr. McInerney put these words in a two-sentence note, addressed "to whom it may concern." Record at 371. The record does not indicate that Dr. McInerney was ever asked to express an all-encompassing opinion on Ms. Sawyer's ability to work at any job, at any time, and it does not indicate that she chose to express such an opinion in this note.

Nor is Dr. McInerney's note accompanied by the kind of comprehensive assessment and evaluation that one would expect in support of this sort of conclusory statement. Indeed, Ms. Sawyer's medical records do not indicate that the Salt Creek Therapy Center, where she saw Dr. McInerney, ever performed such an evaluation. Ms. Sawyer's initial evaluation at Salt Creek Therapy Center, dated June 20, 2009, does not address her cognitive abilities, ability to concentrate, or anything else

that would seem relevant to her ability to work. Record at
397–99. Dr. McInerney's progress notes focus on Ms. Sawyer's
mood, anxiety, interpersonal relations, and ability to perform
daily activities.

Dr. McInerney's progress notes suggest that this note, which
Ms. Sawyer tries to construe as a medical opinion, was in fact
written at Ms. Sawyer's request. The note does not fit with the
other documents generated by Dr. McInerney's treatment of Ms.
Sawyer. Ms. Sawyer claims that it reaches a broad conclusion
about her ability to work in any job, even though Dr. McInerney's
months of progress notes never evaluate her ability to work, and
even though there is no evidence to support such a conclusion.
Dr. McInerney's progress notes from the day the note was written
suggest an explanation. On October 8, 2007, Dr. McInerney noted
that Ms. Sawyer "met [with an] attorney last week." Record at
385. It is also noteworthy that, among the pages of documents
Dr. McInerney submitted to the ALJ, this note immediately follows
an uncompleted form for requesting a leave of absence from Loyola
University Chicago. Record at 370. This suggests that the note
was not a medical opinion based on Dr. McInerney's assessment of
the patient. Rather, it appears to have been written, at Ms.
Sawyer's request, to excuse her from returning to her former work
at Loyola University Medical Center. Thus, there was no reason

for the ALJ to read this note as a medical opinion that Ms. Sawyer was unable to work in any capacity. Indeed, Dr. Appleton had access to the same records from Dr. McInerney, and he found no such thing. Record at 422.

Ms. Sawyer next argues that the ALJ erred in concluding, based on Dr. McInernery's progress reports, that Ms. Sawyer, despite her ups and downs, generally showed improvement over the course of her treatment. This Court finds no error in the ALJ's evaluation of Dr. McInerney's medical opinions. The ALJ's factual determinations will stand if they are supported by substantial evidence. *Steele v. Barhnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Here, there is substantial evidence to support the ALJ's conclusion that Ms. Sawyer generally improved. Over the course of her treatment, Ms. Sawyer went on several trips with family and friends, and managed to enjoy herself despite her difficulties. She resolved to increase her participation in daily activities, and found ways to cope with her anxiety and relieve her anxiety by socializing with friends.

## 2. Dr. Appleton's Opinion

Ms. Sawyer makes a similar argument that the ALJ erred by failing to explain the weight given to the opinion of Dr. Appleton, and failed to resolve purported ambiguities in Dr. Appleton's report. Specifically, Ms. Sawyer argues that, by

41

accepting the opinion of Dr. O'Brien, the ALJ rejected Dr. Appleton's opinion that Ms. Sawyer was "markedly limited" in her ability to understand, remember, and carry out detailed instructions, and to interact appropriately with the general public. Record at 420. Dr. Appleton also opined that Ms. Sawyer was "moderately limited" in her ability to maintain concentration for extended periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Record at 420. Dr. Appleton concluded that, while Ms. Sawyer could not return to her "complex and detailed" past work, she could perform simpler work, with limited social interaction.

Ms. Sawyer correctly notes that, while ALJs "are not bound by findings made by State agency or other program physicians . . . they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Leonard ex rel. Bernard v. Astrue*, No. 08 C 6464, 2010 WL 4705152, at *10 (N.D. Ill. Nov. 10, 2010) (quoting S.S.R. 96-6p). However, Ms. Sawyer identifies no way in which Dr. Appleton's opinions differ from those of Dr. O'Brien. Dr. O'Brien, like Dr. Appleton, opined that Ms. Sawyer would be "restricted to simple tasks." Record at 54. Dr. O'Brien, like Dr. Appleton, opined that Ms. Sawyer could tolerate only "limited, probably incidental

public contact. Record at 54. Dr. O'Brien, like Dr. Appleton, opined that Ms. Sawyer should not interact with the general public. Record at 54.

Dr. Appleton's opinion does not differ in any significant way from Dr. O'Brien's, which the ALJ explicitly accepted. In fact, the two opinions are nearly identical. While the ALJ did not discuss the weight given to Dr. Appleton's opinion, he explicitly discussed the weight given to Dr. O'Brien's identical opinion. Record at 32. Thus, the Court is not persuaded that the ALJ ignored Dr. Appleton's opinion, or that he erred in failing to explain the weight it carried. To the contrary, by adopting an opinion that was, in all relevant respects, the same as Dr. Appleton's, the ALJ implicitly approved of and adopted Dr. Appleton's opinion.

Ms. Sawyer next argues that the ALJ erred in failing to reconcile ambiguities in Dr. Appleton's opinion. Specifically, Ms. Sawyer finds ambiguity in Dr. Appleton's response to Dr. McInerney's purported opinion that Ms. Sawyer was unable to work in any capacity. Ms. Sawyer correctly notes that the ALJ "must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p. However, she identifies no inconsistency or ambiguity in Dr. Appleton's opinion. Dr.

Appleton assessed Ms. Sawyer's residual functional capacity, and identified several impairments Record at 420. Dr. Appleton acknowledged Dr. McInerney's note, but interpreted it as saying that Ms. Sawyer could not return to her former work at Loyola University Medical Center. Record at 422. As discussed above, this interpretation is reasonable and supported in the record evidence. Dr. Appleton then concluded that, despite the impairments he identified, Ms. Sawyer could still work in a setting with "limited social contact" and "ordinary job routines and changes." Record at 422. This opinion is not ambiguous. It is not inconsistent with any medical opinion expressed by Dr. McInerney. It is not inconsistent with the testimony of Dr. O'Brien, which the ALJ explicitly accepted. It is not inconsistent with the ALJ's ultimate decision that, although she could not perform her past work, Ms. Sawyer could perform a number of other jobs. Therefore, the ALJ did not err in his handling of Dr. Appleton's opinion. In December 2007, near the end of her treatment, Ms. Sawyer went on a cruise with friends, and largely enjoyed it. Record at 380. In addition, Ms. Sawyer's speech therapist and physical therapist noted improvement in her performance in their respective fields during the same period. The ALJ had ample evidence to support his conclusion that Ms. Sawyer showed improvement during her period

of treatment by Dr. McInerney.  Therefore, the ALJ did not err by failing to resolve ambiguities in Dr. Appleton's testimony.

### 3.  Dr. Alford's Opinion

Ms. Sawyer argues that the ALJ failed to evaluate or explain the weight given to the opinions of Dr. Alford, a psychologist who evaluated her in July 2007.  Specifically, Ms. Sawyer argues that Dr. Alford opined that she was unable to work, and that the ALJ erred by failing to explain the weight this opinion carried.  Corrected Memorandum in Support of Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security, p. 8.

First, it does not appear to this Court that Dr. Alford ever opined that Ms. Sawyer was unable to work.  He performed a neuropsychological screening of Ms. Sawyer, after which he produced a diagnosis.  His Axis IV diagnosis read "moderate to more severe stressors regarding changes and inability to function, inability to work."  Record at 341.  An Axis IV diagnosis describes "psychosocial and environmental problems that may affect the diagnosis, treatment and prognosis of mental disorders."  DSM-IV, p. 29.  The diagnosis describes a condition or event that has been present in the past, not necessarily something that will continue to be present in the future.  *Id.* Thus, by noting this stressor under Axis IV, Dr. Alford acknowledged Ms. Sawyer's past inability to work, and noted it as

45

a potential cause of stress, which contributed to her other psychological disorders. He was not asked whether Ms. Sawyer had the ability to return to work, and he never expressed any opinion as to whether or not she could do so – whether in her past capacity or in some other capacity.

Nor is this Court persuaded by Ms. Sawyer's argument that the ALJ failed to adequately evaluate those opinions that Dr. Alford actually expressed. Dr. Alford opined that Ms. Sawyer's function at the time of evaluation was "markedly different from her previous level of functioning." Record at 340. He noted "generalized problems with organization and production of intention," "posttraumatic shock," and "signs and symptoms of extreme anxiety and over arousal." Record at 340. These opinions are consistent with those of Dr. O'Brien, which the ALJ explicitly accepted. Dr. O'Brien opined that Ms. Sawyer suffered from PTSD and anxiety, in agreement with Dr. Alford's opinion. Record at 51. Dr. O'Brien noted "moderate difficulties with concentration, persistence, and pace," similar to Dr. Alford's opinion regarding "organization and production of intention." Record at 52. Dr. O'Brien opined that Ms. Sawyer had "[m]ild difficulties with social interaction," Record at 52, similar to Dr. Alford's Axis V diagnosis assigning a GAF of 54, indicating moderate difficulty in social, occupational, or school

functioning. DSM-IV, p. 32. Dr. Alford's opinion was entirely consistent with, if not identical to, Dr. O'Brien's opinion, which the ALJ explicitly accepted. The ALJ did not ignore Dr. Alford's opinion; on the contrary, the ALJ implicitly approved and adopted Dr. Alford's opinion about Ms. Sawyer's limitations by explicitly adopting Dr. O'Brien's nearly identical opinion.

    4. <u>Dr. O'Brien's Opinion</u>

Ms. Sawyer argues that the ALJ's explanation of the weight assigned Dr. O'Brien's opinion is inadequate because he failed to adequately explain the weight given the other sources discussed above. Corrected Memorandum in Support of Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security, p. 9. As discussed above, this Court finds the ALJ's evaluation of the other sources' opinions to be adequate. In this Court's reading, Dr. O'Brien's opinion was largely consistent with those of Drs. McInerney, Alford, and Appleton. Therefore, the ALJ's evaluation of Dr. O'Brien's testimony was proper. The ALJ credited Dr. O'Brien's testimony because he found it most consistent with the medical records before him; that finding is supported in the evidence. The ALJ did not err in his evaluation of Dr. O'Brien's testimony.

B.    Discrepancies Between the VE's Testimony and the DOT

Ms. Sawyer next argues that the ALJ's decision should be reversed because the ALJ failed to address purported inconsistencies between the VE's testimony and the DOT.  In response to the ALJ's finding that Ms. Sawyer was limited to simple work, Record at 83, the VE testified that Ms. Sawyer could perform the jobs of mail sorter, hospital food service worker, and housekeeping/cleaner.  Record at 84.  Each of these jobs has a reasoning level of 3, requiring the worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and "[d]eal with problems involving several concrete variables in or from standardized situations."  Ms. Sawyer correctly notes that, where there is a "potential inconsistency" between the VE's testimony and the DOT, the ALJ's failure to ask about the inconsistency is reversible error.  *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). Here, the ALJ did not ask the VE about any potential inconsistency between his testimony and the DOT.

The Commissioner argues that there was, in fact, no inconsistency between the VE's testimony and the DOT. Commissioner's Motion for Summary Judgment, p. 19.  The Commissioner bases this argument on *Terry v. Astrue*, in which the Seventh Circuit found that jobs with a reasoning level of 3 were

48

not inconsistent with the claimant's limitation to simple, unskilled work. 580 F.3d 471, 478 (7th Cir. 2009). *Terry*, however, is inconsistent with the facts of this case. *Terry* involved a claimant who was limited to simple, unskilled tasks because of physical pain, fibromyalgia, a history of back surgery, and depression. *Id.* at 477-78. The plaintiff in *Terry* never argued that she could not "apply commonsense understanding to carry out instructions," or "[d]eal with problems involving several concrete variables in or from standardized situations." *Id.* at 478. Here, in contrast, Ms. Sawyer's limitation to simple tasks arises from limitations on her ability to concentrate and organize. Record at 52-53. Unlike the plaintiff in *Terry*, Ms. Sawyer's limitation to simple tasks arises directly from her cognitive abilities. Therefore, unlike *Terry*, the facts of this case present a potential conflict between Ms. Sawyer's limitation to simple tasks and the assignment of jobs with a DOT reasoning level of 3.

In order to reverse on this basis, though, the conflict between the VE's testimony and the DOT must also be apparent. *Terry*, 580 F.3d at 478. Since Ms. Sawyer did not identify the conflict at the hearing, she must now show that the conflicts were "obvious enough that the ALJ should have picked up on them without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463

(7th Cir. 2008); *Terry*, 580 F.3d at 478. Here, the conflict between the ALJ's understanding of Ms. Sawyer's cognitive limitations and the level of complexity involved in jobs with a reasoning level of 3 is not "obvious." While the ALJ accepted Dr. O'Brien's opinion that Ms. Sawyer had "moderate difficulties with concentration, persistence and pace," Record at 52, it does not appear obvious from the evidence before the ALJ that Ms. Sawyer would be unable to perform tasks requiring a reasoning level of 3. Even now, she has failed to offer evidence or to explain why she is precluded from performing such tasks. The evidence regarding Ms. Sawyer's limitations in concentration and reasoning did not inexorably lead to the conclusion that she could not "apply commonsense understanding to carry out instructions," or "[d]eal with problems involving several concrete variables in or from standardized situations." Therefore, the ALJ did not commit reversible error by failing to inquire into a potential conflict between his understanding of Ms. Sawyer's limitations, the VE's testimony, and the DOT.

    C.   <u>The ALJ's Evaluation of Ms. Sawyer's Credibility</u>

Next, Ms. Sawyer argues that the ALJ's decision must be reversed because he did not make an explicit determination of her credibility. Ms. Sawyer correctly points out that, "[w]hile we must defer to the credibility determinations of the fact-finder,

50

we must be sure that the ALJ has indeed made a credibility determination." *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984). While the ALJ need not produce "a written evaluation of every piece of testimony and evidence submitted," "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id.* at 79. The ALJ may not, as in *Zblewski*, simply reject all evidence contrary to the agency's position. *Id.* at 78. The Court may not assume that the ALJ would have found the claimant's credibility lacking simply because the ALJ recited the claimant's evidence and then ignored it. *Id.* Here, though, the ALJ did not simply ignore Ms Sawyer's testimony without comment. Ms. Sawyer quotes a passage in which the ALJ makes his assessment of Ms. Sawyer's credibility at the hearing quite clear:

> I was not convinced by the claimant's presentation at the hearing. It is possible that she actually suffers from disorders that grossly constrict her functioning to the degree she described at the hearing, but this is inconsistent with the degree of functioning often prescribed within the medical evidence. Record at 34.

This passage makes clear that the ALJ found Ms. Sawyer's statements about her symptoms incredible, in light of the objective medical evidence to the contrary.

Relatedly, Ms. Sawyer argues that, even if the ALJ made a credibility determination, it was insufficient because he failed to consider the factors required by SSR 96-7p. Corrected Memorandum in Support of Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security, p. 12. SSR 96-7p requires the ALJ to consider the following factors, in addition to the objective medical evidence, when assessing the credibility of an individual's statements:

(1) The individual's daily activities;
(2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
(3) Factors that precipitate and aggravate the symptoms;
(4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
(5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
(6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
(7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, the ALJ explicitly based his determination on the objective medical evidence; indeed, he described in great detail these inconsistencies within the records and between the records and Ms. Sawyer's testimony. He noted that, while Ms. Sawyer initially complained of a severe electrical shock and presented

with "quite dramatic and impressive" symptoms, she "had no physically visible signs of an electrical injury." Record at 32. He noted that, while Ms. Sawyer presented to Dr. Bijari in August 2007 with anxiety and tremors, "the clinical examination was essentially normal." Record at 33. He noted that Dr. Peggau, who evaluated Ms. Sawyer in January 2008, "perceived that the claimant was either embellishing her degree of impairment or malingering." Record at 33. He noted that, while Ms. Sawyer "exhibited no difficulty identifying her treating medical sources" at the hearing, "she exhibited difficulty identifying which was her right hand when being administered the oath." Record at 33.

The ALJ noted Dr. O'Brien's opinion that "there continues to be a lot of inconsistency in the record and the functional limitation of speech seems to come and go, improve and not improve; but doesn't have any physiological basis and is inconsistent with the diagnosis of [conversion] disorder as long as we still have a PTSD that we're looking at. It's just inconsistent." Record at 80. Dr. O'Brien noted that "we vacillate from records which indicate a very severe impairment to records that suggest very good functioning." Record at 52.

The medical records before the ALJ supported his determination that Ms. Sawyer was less than fully credible. Dr. Peggau, who

evaluated Ms. Sawyer for the agency on January 11, 2008, noted an "extremely dramatic" presentation, Record at 402, that caused him "concern that the claimant may have been embellishing some of her impairment, or malingering throughout the evaluation." Record at 404. On that day, Ms. Sawyer "walked with a shuffling gait like a geriatric resident." Record at 402. She said she did not know the date or year. Record at 403. She could not name the current president or any other president, other than George Washington. Record at 403. She could not name five famous living people or five large cities. Record at 403. When asked to name the colors of the American flag, "[s]he sobbed hysterically" and "kept saying '[a] flag, a flag, a flag, a flag, a flag.'" Record at 403. She was unable to recall any digits in reverse order, even though Dr. Peggau noted that "[t]he record indicated that she was able to complete this part of the task." Record at 403. She was unable to complete simple arithmetic, like multiplying 2 x 4 or 3 +4. Record at 404.

Despite this impressive presentation, Ms. Sawyer's psychiatrist, Dr. Lima, had noted no such impairments on January 7, 2008 — just four days earlier. Nor had Ms. Sawyer's therapist, Dr. McInerney, noted such severe impairments during her weekly visits from June 2007 to December 2007. Record at 377-97. To the contrary, during this period, Ms. Sawyer went on

a cruise with friends, Record at 379, went to Arizona, Record at 388-89, and went to Las Vegas, Record at 548.

The ALJ further noted that the testimony of Dr. McKenna, the expert in internal medicine, identified even more ways in which Ms. Sawyer's complaints were inconsistent with the objective medical evidence. Dr. McKenna noted that there was no medical explanation for Ms. Sawyer's symptoms. Record at 79-80. He noted that Ms. Sawyer's MRI of the brain and EEG were normal, and that, despite her complaints, loud noises could not cause her to pass out. Record at 78. He noted that, immediately after her shock, Ms. Sawyer had "complained that she was paralyzed on her left side. And of course that was something that did not pan out." Record at 79.

It is clear that the ALJ had ample evidence before him on which to base his evaluation of Ms. Sawyer's credibility. He explicitly made a credibility determination, and explicitly based that determination on the objective medical evidence before him.

## CONCLUSION

For the reasons set forth above, the Court denies Ms. Sawyer's Motion for Summary Judgment [#22] and grants the Commissioner's Motion for Summary Judgment. The decision of the Commissioner is affirmed.

Dated: December 6, 2011

E N T E R:

ARLANDER KEYS
United States Magistrate Judge